IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ESTATE OF LUIS VASQUEZ, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 20-cv-01229 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| CITY OF CHICAGO, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

In July 2019, two handcuffed individuals flagged down police officers, explaining that they had been kidnapped the night before and escaped when one of the kidnappers fell asleep. The victims pointed the officers to the building where they had been held and told Chicago Police Department ("CPD") Officer Michael Barton that the man who had kidnapped them was armed and asleep. Barton and other officers entered the building, and Barton was the first one to encounter Luis Vasquez lying down on a couch with a gun beside him. Barton announced his presence, and Vasquez, startled, moved to rise from the couch, in the process making contact with the gun. Barton opened fire, killing him. The incident was captured on Barton's body-worn camera ("BWC"). Vasquez's estate ("Estate"), through its independent administrator, Anna Montalvo, has now sued Barton for excessive force, wrongful death, and survivorship, and the City of Chicago ("City," collectively, "Defendants") for indemnification. Defendants have filed a motion for summary judgment. (Dkt. No. 78.) For the reasons stated below, their motion is denied.

## BACKGROUND

### I. Preliminary Evidentiary Issues

Before summarizing the material facts, the Court addresses the parties' disputes over the material filed in conjunction with Local Rule 56.1. Under that rule, a party moving for summary judgment must file, along with its brief, a statement of material facts. L.R. 56.1(d). Then, when the responding party files its opposition brief, it must also respond to that statement of facts. L.R. 56.1(e). The response must "admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." L.R. 56.1(e)(2). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

In this case, the Estate did not file a response to Defendants' Statement of Facts (Defs.' Statement of Facts ("DSF"), Dkt. No. 79), even though it filed its own Statement of Additional Facts (Pl.'s Statement of Additional Facts ("PSAF"), Dkt. No. 94), in which it offers competing factual assertions. For this reason, Defendants contend the Court should deem their Statement of Facts admitted in full. The Estate ostensibly viewed a response as unnecessary given the parties' extensive reliance on the BWC footage, which is the primary subject of the Estate's Statement of Additional Facts and the basis for its claim that disputed issues of fact preclude summary judgment. Nonetheless, it must be noted that by failing to comply with the Local Rules, counsel for the Estate risked serious prejudice to their client. The Seventh Circuit has "repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary judgment motions." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009). The Court could therefore deem the Estate's failure to respond properly to Defendants' Statement of Facts as admitting its contents.

Yet in this case—involving a deadly shooting captured on video—the Court exercises its discretion and declines to exact such a high cost for the Estate's lack of compliance with the

local rules. Indeed, the BWC footage is the focal point of the parties' arguments and the Court's analysis. "When video footage firmly settles a factual issue, there is no genuine dispute about it, and [courts] will not indulge stories clearly contradicted by the footage." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). On the other hand, a video may be "unclear, incomplete, and fairly open to varying interpretations." *Id.* The Court will therefore account for the competing interpretations each side offers for any vague aspects of the BWC footage. To the extent Defendants' Statement of Facts concerns subject matter outside the scope of the BWC footage, though, the Court will treat the asserted facts as undisputed. (*See* Pl.'s Resp. at 1–2 (citing some of these facts), Dkt. No. 93.)

Additionally, Defendants object to the Court's consideration of Exhibit K, offered by the Estate in support of its Statement of Additional Facts. Exhibit K is a compilation of 506 frame-by-frame images taken from Barton's BWC footage. The Court agrees that the images are of limited evidentiary value as a substantive matter because an image without context does not reflect the "fluid nature of these situations." *Horton*, 883 F.3d at 950. Thus, while the Court declines to strike Exhibit K, it does not rely upon Exhibit K in its assessment of the claims

Next, Defendants argue that Exhibits L and M offered by the Estate are inadmissible due to a lack of foundation. Exhibit L is Vasquez's autopsy report, and Exhibit M is the autopsy diagram. (PSAF, Exs. L, M, Dkt. Nos. 97–98.) "[T]he Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014). Defendants offer no reason why the facts contained in these exhibits would be inadmissible at trial, so their objections are overruled. In any event, Exhibits L and M do not affect the analysis either.

3

Finally, Defendants take issue with multiple assertions from the Estate's Statement of Additional Facts on myriad bases, such as objecting that they lack of evidentiary support. These objections are overbroad. Most notably, Defendants exaggerate the clarity of the BWC footage, as the Court discusses below. Moreover, to the extent the Estate's submission is not wholly compliant with Local Rule 56.1, the Court will not exercise its discretion to strike those facts. Instead, the Court will consider the parties' respective filings in line with controlling evidentiary principles. *See Oxford Bank & Tr. & Fifth Ave. Prop. Mgmt. v. Village of La Grange*, 879 F. Supp. 2d 954, 960 (N.D. Ill. 2012) ("The Court is capable of disregarding statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, or contain unfounded, irrelevant, or unsupported assertions of fact. Thus, consistent with its obligations under the federal and local rules, the Court will rely only on material statements of fact which are both admissible and supported by the record."). So, for the Estate's assertions regarding the BWC footage, the Court will reference the footage itself to confirm whether there is adequate support.

**II.     Summary of Facts**

The Court recounts the following facts drawn from the parties' submissions pursuant to Local Rule 56.1, including the BWC footage submitted as an exhibit, in the light most favorable to the Estate, as the non-moving party. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017).

In July 2019, Barton responded to a call indicating that two handcuffed individuals, one male and one female, had been found. (DSF ¶ 12.) Barton was wearing his full police uniform. (*Id.* ¶ 11.) His BWC footage captured the two victims telling Barton they had been kidnapped. (*Id.* ¶¶ 11, 15.) The male victim stated that they had escaped out the back of the building where they had been held hostage after the kidnappers fell asleep, which he later helped Barton locate.

4

(*Id.* ¶¶ 27, 30–31.) The victims said there were three kidnappers, one of whom was asleep in the building and was armed. (*Id.* ¶¶ 23, 25.)

When Barton brought the male victim to the location to identify the building, the victim stated that the armed kidnapper was asleep on the second floor in the last room on the left. (*Id.* ¶ 33.) Barton's BWC footage shows him climb the stairs in the back of the building to the second floor, where, upon entering an open door, he found a long hallway with three doors on the left. (*Id.* ¶ 42.) Two other officers followed him into the building. (*Id.* ¶¶ 37–38.) Barton went into the first two rooms and confirmed they were empty. (*Id.* ¶ 43.) He was the first officer to reach the last doorway on the left, where he observed a male figure—who turned out to be Vasquez—lying on a couch with his arms over his head and a gun on the couch cushion several inches from him. (*Id.* ¶¶ 45–48.) The Estate asserts that Vasquez was sleeping at the time, but Defendants suggest he was awake because his hands were moving. (Defs.' Resp. to PSAF ("DRPSAF") ¶ 4, Dkt. No. 101.) Barton shouted that he was with the Chicago Police Department and, with his gun drawn and aimed at Vasquez, ordered him not to move. (DSF ¶ 49; DRPSAF ¶¶ 2–3.)

The parties dispute what took place next, even though the full exchange was captured by the BWC. Barton contends that Vasquez made eye contact with him, moved his hand towards the gun, grabbed the gun with his left hand, and was in the process of moving his right hand to grab the back of the gun while sitting up. (DSF ¶¶ 49–54.) Conversely, the Estate contends that Vasquez raised his hands in a surrender gesture and swung his legs to sit upright. (DRPSAF ¶¶ 5–6.) Although the Estate does not assert that Vasquez never made contact with the gun, it contends that he did not place the gun in a shooting position, did not point the gun at anyone, and did not discharge the gun. (*Id.* ¶¶ 19–20.) Defendants agree that Vasquez did not point or discharge the gun but disagree that the gun was never in a shooting position. (*Id.*) Based on the

5

Court's review, the BWC footage is not clear as to Vasquez's control of the gun, or lack thereof. Certainly, he was startled by Barton's presence. And the footage does show that Vasquez's left hand likely made contact with the gun. But it is unclear whether Vasquez intentionally reached for the gun or made incidental contact with it as he moved from his original position on the couch. Likewise, it is difficult to discern the movements of Vasquez's right hand and whether they are consistent with sitting up to surrender or with reaching for the gun.

Almost immediately after Vasquez's left hand came into contact with the gun—roughly five seconds after Barton had issued his first order not to move—Barton opened fire. (*Id.* ¶¶ 3–10.) Vasquez sustained several gunshot wounds (*id.* ¶¶ 22–23), and he eventually died (Compl. ¶¶ 12–13, Dkt. No. 1). The Estate sued Barton and the City of Chicago, asserting four counts. Count I alleges a violation of Vasquez's Fourth Amendment rights due to the use of excessive force under 42 U.S.C. § 1983. Count II alleges wrongful death under Illinois state law. Count III alleges a survival action under Illinois law. And Count IV seeks indemnification from the City for any damages for which Barton is ultimately held responsible.

## DISCUSSION

At the summary-judgment stage, a court must determine if a genuine issue of material fact exists such that a reasonable jury could return a verdict for the nonmoving party. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010). The court's function is to "determine whether there is a genuine issue for trial," not to make determinations of truth or to weigh the evidence. *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087 (7th Cir. 2018). Courts are to avoid "the siren song that tempts [them] into making factual determinations at the summary judgment stage." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021). In deciding whether there is a genuine issue, the Court must "construe all facts and reasonable inferences" in the light most favorable to the nonmoving party. *Nischen*, 865 F.3d at 928.

### I. Excessive Force (Count I)

"A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). Defendants first argue that Barton's actions were objectively reasonable. In the alternative, they argue that Barton is entitled to qualified immunity. The Court considers these arguments in turn.

#### A. Merits of the Claim

In assessing an excessive force claim, courts engage in a fact-dependent inquiry that "require[es] consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Because "police officers are often forced to make split-seconds judgments," the Court must view the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97. "[T]he reasonableness inquiry is an objective one, which examines whether the officer's actions are objectively reasonable in light of the totality of the facts and circumstances confronting him or her . . . ." *Williams*, 797 F.3d at 473. Given the fact-intensive nature of the analysis, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Taylor v. City of Milford*, 10 F.4th 800, 811 (7th Cir. 2021) (internal quotation marks omitted). This is especially so "where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony— the victim—cannot testify." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

"When an officer reasonably believes an assailant's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer

7

can reasonably exercise the use of deadly force." *Horton*, 883 F.3d at 949 (internal quotation marks omitted). The Seventh Circuit's decision in *Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021), is instructive. In that case, officers suspected the plaintiff of having stashed a firearm on a roof, and when they were attempting to apprehend him after a standoff, the plaintiff made a move towards the ground, at which point the officers shot him. *Id.* at 731–33. The officers' BWCs captured the incident. *Id.* at 732–33. Whereas the officers contended that it appeared as if the plaintiff was diving for a hidden gun or moving threateningly forward, the plaintiff insisted he had been going to the ground to surrender as he had been instructed. *Id.* After viewing the BWC footage, the district court denied the officers' motion for summary judgment as to the merits of the excessive-force claim as well as their entitlement to qualified immunity. *Id.* at 734, 737–38.

On interlocutory appeal of the qualified-immunity issue, the Seventh Circuit held that issues of material fact foreclosed its exercise of appellate jurisdiction. *Id.* at 750; *see also id.* at 736 ("Jurisdiction is not proper when all of the arguments made by the party seeking to invoke our jurisdiction are dependent upon, and inseparable from, disputed facts." (internal quotation marks omitted)). With respect to the first prong of qualified immunity—which asks whether there was a constitutional violation—the Seventh Circuit highlighted two particular factual disputes: how the plaintiff "moved to the ground before and as he was shot" and, relatedly, whether he "presented an immediate threat to the" officers. *Id.* at 739. There remained "an open factual dispute whether [the plaintiff] appeared to be surrendering or continuing to actively resist" when he went to the ground. *Id.* at 740. The BWC footage did "not blatantly contradict or corroborate the version of events for one side or the other." *Id.* And the difference between the interpretations was crucial. "If the video is viewed as [the plaintiff] surrendering, no reasonable officer would shoot in those circumstances. If viewed as not surrendering . . . then the use of

8

force may have been justified." *Id.* Given the questions of fact, the Seventh Circuit lacked appellate jurisdiction to decide whether there was a violation of the plaintiff's Fourth Amendment rights for purposes of resolving the officers' entitlement to qualified immunity. *Id.* at 742.

To be sure, the Seventh Circuit's assessment of the constitutional violation took place in the context of qualified immunity, and its ultimate holding that it lacked appellate jurisdiction is not relevant to the motion before this Court. Still, *Smith*'s analysis regarding the disputes of material fact affecting the excessive-force inquiry offers a useful analogy for the Court's task here. *See id.* at 738–42 (applying the *Graham* factors). The Court thus considers the *Graham* factors with these principles in mind.

### 1. Severity of the Crime

The first *Graham* factor, the severity of the crime, is not in dispute. The Estate concedes that Vasquez was the prime suspect for an aggravated kidnapping offense and further that this is a serious offense. The first factor therefore weighs in favor of Defendants.

### 2. Immediate Threat

Next, Defendants argue that Barton exercised reasonable force in light of the immediate threat Vasquez presented, as evidenced by the BWC footage. But the BWC video does not reveal whether Vasquez purposefully went to grab the gun, the extent to which he had control over the gun, or, moreover, how a reasonable officer would have interpreted Vasquez's actions as he arose from the couch. "[V]ideos, or portions of them, can be viewed differently." *Id.* at 747.

On the one hand, Vasquez is clearly startled by Barton's presence, and the gun can be seen moving as he makes contact with it. Perhaps a reasonable officer would have thought that Vasquez panicked and intentionally grabbed the gun, as Defendants contend. On the other hand, the BWC footage shows Vasquez raising his arms in the air upon hearing Barton announce his

9

presence in something akin to a traditional surrender gesture. His demeanor aligns with the Estate's assertion that he had been awoken from sleep. And Barton was dressed in his police uniform, so Vasquez's movement to extend his arms into the air could be viewed as a groggy attempt to surrender to law enforcement. If a jury found this interpretation convincing, it could conclude that a reasonable officer would have understood Vasquez's actions differently: that, when Vasquez was startled awake and moved to rise from the couch, he placed his hand or forearm where it most naturally fell on the couch—which happened to be next to the gun—thereby incidentally causing the gun to fall off the couch. Indeed, given the placement of the gun directly next to Vasquez, a reasonable officer might have understood such incidental contact to be all but inevitable.

It follows that a reasonable juror could conclude that Barton had no basis to suspect that he or his fellow officers faced an immediate threat. *Horton*, 883 F.3d at 950. Defendants cite a number of cases finding that deadly force was objectively reasonable when facing far more acute threats, such as suspects aiming a gun at officers. *Estate of Escobedo v. Martin*, 702 F.3d 388, 410–11 (7th Cir. 2012) (pointing gun at officers); *Muhammed*, 316 F.3d at 683 (aiming gun at officers); *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018) (threatening warning shot). But no such danger was present here; Vasquez did not point or aim the gun. Granted, if a reasonable officer would have understood Vasquez to be attempting to grab the gun, Barton almost certainly would have been entitled to use deadly force. However, if a reasonable officer would have viewed Vasquez was surrendering, deadly force would have been unwarranted. *See Smith,* 10 F.4th at 740 ("If the video is viewed as [the plaintiff] surrendering, no reasonable officer would shoot in those circumstances."); *cf. Estate of Clay v. City of Chicago*, No. 23 C 2415, 2024 WL 4296652, at *2 (N.D. Ill. Sept. 16, 2024) (denying a motion to dismiss because, accepting as true

10

the "plaintiffs' allegation that [the decedent] was moving to place his gun on a ledge at the moment [the officer] shot him, it is plausible that a reasonable officer would have understood [the decedent] to be surrendering," meaning "the use of deadly force would not have been justified"). A question of material fact remains on this issue, notwithstanding the BWC footage. For summary-judgment purposes, this factor thus weighs in favor of the Estate.[1]

### 3. Active Resistance

For similar reasons, there is a question of material fact regarding the third factor, which asks whether Vasquez actively resisted arrest. Defendants posit that Vasquez disobeyed multiple commands not to move. But by Defendants' own recounting, from the time Barton ordered Vasquez not to move to the time he fired his first shot, a mere four seconds had passed. A juror could find that Vasquez's failure to freeze immediately upon apparently being startled awake would not indicate to a reasonable officer that he was resisting arrest. *Cf. Gant v. Hartman*, 924 F.3d 445, 450 (7th Cir. 2019) (holding there was no appellate jurisdiction in part because there was a question of fact about whether the plaintiff had "time to respond to [offices'] orders when [an officer] shot him"); *Coleman v. Moldenhauer*, No. 14-CV-1234-JPS, 2015 WL 6680225, at *7 (E.D. Wis. Nov. 2, 2015) ("[It remains unclear whether a reasonable officer could even expect a suspect to comply with his or her orders after deploying flash bangs in the nearby vicinity.").

Simply put, "[f]rom the objective perspective of a reasonable officer on the scene, a factual dispute exists as to what [Vasquez] appeared to be doing directly before and as shots

---

[1] In *Smith*, the Seventh Circuit distinguished cases where "the suspect [was] holding or touching a weapon when shot" as supporting appellate jurisdiction (and warranting qualified immunity). *Smith*, 10 F.4th at 745–46. Here, there is no question that Vasquez made contact with the gun as he rose from the couch. But given the circumstances—that Vasquez was abruptly awoken, or so the BWC video plausibly suggests, with a gun placed precariously nearby—the Court concludes that there is a question of fact as to whether a reasonable officer would have viewed this contact as incidental and non-threatening. *See Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020) ("[S]omeone does not pose an immediate threat of serious harm solely because he is armed." (internal quotation marks omitted)).

were fired." *Smith,* 10 F.4th at 740. The BWC footage could be viewed as supporting the Estate's position that Vasquez was attempting to surrender, not resisting. And at this stage, the Estate receives the benefit of all reasonable inferences.

### 4. Totality of the Circumstances

Overall, the *Graham* factors counsel against granting summary judgment. As the Estate concedes, the first factor weighs in favor of Defendants. But the latter two factors entail disputes of material fact that must be resolved in the Estate's favor. And under that view, Vasquez was shot as he attempted to surrender. A reasonable juror may disagree, but it is not the Court's role to make "factual determinations at the summary judgment stage." *Gupta*, 19 F.4th at 996. In fact, the ambiguous character of the BWC footage aligns with the notion that summary judgment is often inapt in excessive-force cases—especially when the would-be plaintiff has died. *Cyrus*, 624 F.3d at 862. Nonetheless, in reaching its conclusion here, the Court acknowledges that in many cases a review of BWC or other video footage will be determinative of the material facts and summary judgment will be appropriate. The Court does not mean to suggest otherwise. It simply finds that this is not one such case. Accordingly, Defendants' motion for summary judgment is denied with respect to the merits of the Fourth Amendment claim.

### B. Qualified Immunity

Next, Defendants raise a qualified immunity defense. Even if an officer would otherwise be liable for a constitutional violation, qualified immunity shields them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense that, once raised, the plaintiff must defeat; the Estate "bears the burden of showing that the constitutional right allegedly violated was clearly established at the time of the challenged conduct." *Purvis v. Oest*, 614 F.3d 713, 717

12

(7th Cir. 2010). The Court must answer two questions: "first, whether the facts, taken in the light most favorable to [Vasquez], describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation." *Smith*, 10 F.4th at 737. If the answer to either is "no," the officer is entitled to qualified immunity. *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019).

As explained above, the analysis for the first prong of qualified immunity mirrors the analysis for the merits of the underlying Fourth Amendment claim. And the Court finds that there is a genuine dispute as to whether Barton violated Vasquez's Fourth Amendment rights. On the first prong of qualified immunity, then, the "existence of material factual disputes precludes a ruling" at this stage. *Smith*, 10 F.4th at 749 (internal quotation marks omitted).

The Court turns next to the second consideration for qualified immunity: whether the constitutional right at issue was clearly established on July 8, 2019. *Purvis*, 614 F.3d at 717. The first task is defining the right at issue. As the Seventh Circuit noted in another context, "the legal landscape of excessive-force claims is well settled," and "[o]fficers have clear guidance on the level of force that is reasonable when arresting a suspect who does not resist." *Snowden v. Henning*, 72 F.4th 237, 246 (7th Cir. 2023). Once more, *Smith* is instructive. The Seventh Circuit held that, as of August 31, 2017—the date of the incident in that case, which predates the incident here—"shooting an unarmed and surrendering suspect who was not actively resisting in the moments before shooting and who posed a diminishing threat would violate clearly established law." *Smith*, 10 F.4th at 742–43; *see also Gant*, 924 F.3d at 451 ("[I]t is unreasonable to use deadly force against a suspect who is not resisting arrest and who is genuinely attempting to surrender.").

13

Accordingly, the same material disputes of fact identified previously preclude applying qualified immunity based on the clearly-established prong. The BWC footage does not resolve for summary-judgment purposes whether a reasonable officer would view Vasquez as resisting or surrendering at the time he was shot. In the latter scenario, which the Court must accept at this stage, lethal force would be unreasonable. *Smith*, 10 F.4th at 740. Put another way: if the facts at trial lead to the conclusion that a reasonable officer in Barton's position would have known that Vasquez was attempting to surrender—an interpretation the BWC footage plausibly supports—Barton's use of deadly force would violate clearly established law. Defendants' motion for summary judgment is therefore denied on the basis of the second requirement for qualified immunity.

To be clear, the Court is not holding that Barton is ***not*** entitled to qualified immunity as a matter of law. When it is "impossible to resolve the qualified immunity question before trial," as it is here, courts "may consider qualified immunity after trial." *Taylor*, 10 F.4th at 812. "There may be a set of facts, established at trial, under which [Barton's] use of force was not excessive, or was not clearly established as excessive." *Id.* In resolving this question at trial, courts may "use a specific jury verdict form to prove the facts that the jury finds to aid in any post-verdict determination of qualified immunity." *Id.* And the Court will consider doing so here. For purposes of the present motion, however, it suffices that the Court cannot resolve these factual disputes at this stage. Thus, Defendants' motion for summary judgment as to Count I is denied.

## II.     State Law Claims

The Estate also asserts three state law claims: Count II for wrongful death under the Illinois Wrongful Death Act ("IWDA"), 740 ILCS 180/0.01 *et seq.*, Count III under the Survival Act, 755 ILCS 5/27-6, and Count IV against the City, seeking indemnification. Defendants move for summary judgment on all three.

The IWDA authorizes a private action for damages "[w]henever the death of a person" was "caused by wrongful act, neglect or default" such that the person could have "maintain[ed] an action" if "death had not ensued." 740 ILCS 180/1. And under the Survival Act, "personal injury suits survive the plaintiff's death and inure to the benefit of the plaintiff's estate." *Malone v. Nielson*, 474 F.3d 934, 937 (7th Cir. 2007). Defendants invoke two Illinois statutes to argue that Barton is immune on these Counts. First, they cite 720 ILCS 5/7-5, which provides "an affirmative defense to wrongful death" claims. *Horton v. City of Chicago*, No. 13-cv-6865, 2018 WL 4699790, at *11 (N.D. Ill. Sept. 30, 2018). This defense applies if "a court finds that an officer's use of deadly force was objectively reasonable." *Mendez v. City of Chicago*, No. 18-cv-6313, 2022 WL 4466235, at *19 (N.D. Ill. Sept. 26, 2022). Second, Defendants argue that the Illinois Tort Immunity Act ("ITIA"), 745 ILCS 10/2-202, bars Counts II and III. The ITIA "protects local public employees from liability for actions 'committed in the execution of or enforcement of any law unless such act or omission constitutes willful and wanton conduct.'" *Horton*, 2018 WL 4699790, at *12 (quoting 745 ILCS 10/2-202).

The analysis for both defenses tracks the analysis for the excessive-force inquiry under the Fourth Amendment. *See id.* at *13 (framing the question for the two defenses as "whether, viewing the evidence in the light most favorable to [the plaintiff], [the defendant's] use of force complied with the Fourth Amendment"). As explained above, questions of material fact preclude summary judgment with respect to the Estate's Fourth Amendment claim. Those disputes of fact mean that Defendants are not entitled to summary judgment on the state law claims.

Summary judgment on Count IV is denied too. Defendants argue that, if none of the claims against Barton survive summary judgment, there is nothing for the City to indemnify. But the Court has declined to enter summary judgment on those claims, so this argument fails.

15

## CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment (Dkt. No. 78) is denied.

ENTERED:

Dated: September 30, 2024

_____
Andrea R. Wood
United States District Judge